UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

WINDWARD ASSOCIATES CORP. a Florida
corporation,

                Plaintiff,

vs.                     Case No.  2:08-cv-650-FtM-29DNF

M/Y ESTEREL her engines tackle
equipment, rigging, dinghies,
furniture, appurtenances, etc. a
Cayman Island  Documented Vessel,
WILSON YACHT MANAGEMENT (USA), LLC a
Florida Limited Liability Company,

                Defendants.
_____

**OPINION AND ORDER**

_____This matter came before the Court for a bench trial on
November 4, 5, and 6, 2009.  The Court heard live testimony from
Winfield Austin, Kelly Seger, and Roy Shorter, and testimony by
deposition from Eric Maitre, Douglas Obrecht and Peter Knox.  The
Court also received numerous exhibits from both sides, and heard
argument from counsel.

Plaintiff Windward Associates Corp. (Windward Associates or
Plaintiff) filed a two-count Verified Complaint In Rem and In
Personam.  (Doc. #1.)  Count 1 seeks enforcement of a maritime lien
against the M/Y ESTEREL (the M/Y ESTEREL or the Vessel).  Windward
Associates asserts that it possesses a maritime lien against the

Vessel for $74,644.28[1] for necessaries supplied during the course of refurbishing the Vessel. Count 2 alleges that Wilson Yacht Management (USA), LLC (Wilson Yacht) entered into a contract with Windward Associates to repair/refurbish and provide necessaries to the M/Y ESTEREL, that Windward Associates performed the services and provided necessaries to the Vessel as delineated by specific invoices, and that Wilson Yacht has refused to pay the $74,644.28 due and owing, thereby breaching its contract. Defendants filed an Answer and Affirmative Defenses (Doc. #19) which included seven affirmative defenses. The parties' Pretrial Statement succinctly states the case: "The Defendants claim they overpaid. The Plaintiff claims it was underpaid." (Doc. #47, p. 2, ¶ 2.)

The Court makes the following findings of fact and conclusions of law pursuant to FED. R. CIV. P. 52(a).

## I.

Wilson Yacht is engaged in the business of yacht management. In May 2006, Allan Wilson (Wilson), the principal of Wilson Yacht, began e-mail and verbal discussions with Mr. E. Molina (Molina or the Owner), the beneficial owner of the 110 foot vessel M/Y ESTEREL, concerning Molina's plans to bring the yacht to Florida from Mexico for repairs. (Defendants' Exhs. B, C.) Molina agreed that Wilson Yacht was to oversee the refit of the M/Y ESTEREL and

---

[1] The Complaint alleges that nine specifically identified invoices were not paid. The amount claimed was corrected at trial to $72,777.42 when one invoice was eliminated because it related to a different vessel.

a second smaller yacht not at issue in this case. In June, 2006, Seger Performance, by and through its principal Kelly Seger (Seger), agreed to be the project manager looking after the day to day requirements of the refit of both vessels. (Defendants' Exhs. D, E.) Seger was on the job site daily. Work started on the M/Y ESTEREL in mid-June, 2006, and Wilson kept in contact with Molina concerning the progress of obtaining quotes, approval for various components of the work, and funding of the work. (Defendants' Exhs. F, H, I, K, L.)

Windward Associates is a Florida corporation engaged in the business of interior yacht refurbishment. Winfield Austin (Austin) is the president and operating officer of Windward Associates. In late 2006 or early 2007, Austin was approached by Wilson about performing interior refurbishing work on the M/Y ESTEREL as part of the larger overhaul and refurbishing of the Vessel. As Austin knew, Wilson was acting as the agent of the Owner of the M/Y ESTEREL, and would come to know the Owner's name and the name of the corporation which held title to the Vessel.

In March or April 2007, Austin examined the Vessel with Wilson and Seger, and prepared a time and materials proposal of approximately $800,000.00. The Owner rejected this proposal as too expensive. On April 27, 2007, Austin submitted Invoice #526 to Wilson Yacht for time spent planning and meeting with the Owner and for fabrication of dashboard structure between March 23 and April

19, 2007. (Plaintiff's Exh. 1.)[2]  Invoice #526 was paid on May 9,

2007. (Defendants' Exh. O.)

A second meeting was held at the Vessel, this one attended by

Austin, Wilson, Seger, and Claudia Molina, the daughter of the

Vessel's Owner.  As a result of this meeting, the scope of work was

pared down, and Austin agreed to prepare another proposal.  In a

May 1, 2007 e-mail from Wilson to Molina, Wilson stated:

> After the last visit by your Daughter Claudia, the
> interior outfitter is producing a quote including
> duration of works.
> The initial indications are that this will be in the
> region of $500,000-$600,000 and take up to 3 months to
> complete.
> This will include refurnish every Cabin, bathroom,
> saloon, dining room, gallery, crew area.  I am back in
> Lauderdale next week (Wednesday) and will go through the
> proposal to see where any time and money can be saved
> whilst still maintaining the required quality.
> The interior refit is a very delicate area the sub
> contractor is known to me and does excellent work and
> compared others his prices are reasonable however to make
> any significant cost saving (if required) further input
> from yourself or Claudia will be needed.

(Plaintiff's Exh. 28.)  Molina responded by e-mail that he was

sending money and requested a resume of the total expenses and a

new estimate of the costs.  Id.

Without a formal contract, Windward Associates began

performing work on the M/Y ESTEREL.  Austin testified that he

charged $60 per hour for his employees, which was below the typical

$65-70 per hour charged by his competitors.  Austin's mark-up was

---

[2] The parties have submitted many of the same documents as
exhibits.  The Court typically will refer to only one party's
exhibit number for the same document.

15%, compared to 15-30% by his competitors.  All the evidence confirms that these rates are reasonable amounts.

In a June 22, 2007, e-mail, Austin sent Wilson and Seger a second proposal, which he referred to as the "Revised Esterel Work List."  (Plaintiff's Exh. 29.)  This eight page spreadsheet contained 218 line items describing the work to be performed in 17 areas of the vessel and the price "Estimate" for each line item. The last page included the following statement: "This task sheet represents most of the work to be accomplished at this time.  There will always be unforeseen items that will arise thoroughout [sic] the project.  Thus, it is a good idea to allot an additional 10% to the total project estimate."  Id.  The total estimate was for $444,670.00; with the added ten percent, the total estimate was $489,137.00.  Id.  Austin testified that this was a "time and materials" proposal, and the Court agrees.

Still without a formal contract, Windward Associates continued to perform work on the M/Y ESTEREL.  Austin sent invoices to Wilson every two weeks, identifying the time period, the description of the work done, the number of hours, the rate, and the total dollar amount billed.  On July 10, 2007, Austin sent Invoice #606 to Wilson Yacht for work performed between May 4 and June 28, 2007. (Plaintiff's Exh. 2; Defendants' Exh. T.)  On July 18, 2007, Austin sent Invoice #662 to Wilson Yacht for work performed between June 29 and July 12, 2007.  (Plaintiff's Exh. 3.)  On July 31, 2007,

Austin sent Invoice #682 to Wilson Yacht for work performed between July 12 and July 26, 2007.  (Plaintiff's Exh. 4.)

Wilson told Austin he did not want to write checks every two weeks for the various invoices.  In an August 21, 2007, e-mail, Wilson asked Austin to send Austin's bank details so they could settle the outstanding invoices.  Wilson wanted a payment schedule with invoices, and suggested a 30% deposit with two 25% stage payments followed by a 20% final payment.  (Plaintiff's Exh. 30.) Austin responded by e-mail that they could "work payment any way that works best for you" and agreed to send invoices and to work with the draws Wilson suggested.  Id.  Invoices #606, 662, and 682 were paid on August 22, 2007.  (Defendants' Exh. Y.)

Austin submitted Invoice #721 to Wilson Yacht on August 21, 2007, requesting the first payment draw for interior refurbishing "per refit work list dated 6/22/07" in the amount of $122,284.25. (Plaintiff's Exh. 5.)  Austin sent Wilson Yacht Invoice #709 dated August 22, 2007, for work performed between July 27 and August 9, 2007.  (Plaintiff's Exh. 6.)

In late August 2007, Austin met at the Vessel with Seger, the Owner and Claudia Molina.  Austin and the Owner agreed to the second proposal.  Seger testified that he asked Austin if he was sure he could do the work for no greater than the proposal amount plus ten percent, and that Austin said yes.  From this, Seger believed there was a fixed price contract.  However, Seger had no involvement in the financial matters related to the work, and as

discussed below in more detail, the Court finds there was no fixed price contract in this case.

In an August 30, 2007 e-mail from Austin to Wilson, Austin stated: "After our meeting with Mr. Molina last week, he said it was a go! Hence, does this also mean you have the money now. If so, how do you propose moving forward." (Plaintiff's Exh. 31.) On the same day, Wilson responded by suggesting "a simple agreement attached to the quote for the works agreed showing a payment schedule as discussed and a completion date with the possibility of a small penalty clause for late finishing which starts 2 weeks after the proposed completion date." Id. Wilson also outlined his ideas on the agreement, including that: The agreement would be between Windward & Associates and Lady B. Inc., the owner of M/Y ESTEREL; the work was to refurbish the interior of the vessel "as per the attached quotes and in the style agreed with the owners"; the contract duration was three months; the completion date was December 1, 2007; there would be a penalty clause for delay; and the payment terms would be 25% on signing, 25% after 1 month, 25% after 2 months, 15% after 3 months, and 10% upon completion. Id. By responsive e-mail the same day, Austin stated it was not a problem putting together a working/project agreement, but disagreed with some of the proposed terms. (Plaintiff's Exh. 31.) Austin agreed to put together a proposal and get Wilson an invoice in the meantime. Id.

Austin sent Wilson Yacht Invoice #738 by e-mail dated August 31, 2007 for the "Revised Work List dated June 22nd, 2007" in the amount of $122,284.25. (Defendants' Exh. CC.) This amount was 25% of the June 22, 2007 proposal-plus-ten-percent total amount ($489,137.00). Invoice #738 was paid on September 6, 2007. (Defendants' Exh. DD.)

In a third "Proposal: M/Y Esterel Interior Refit" dated September 7, 2007, Austin proposed an agreement between his company and Lady B Inc., the owner of the M/Y ESTEREL. (Plaintiff's Exh. 32.) The proposal outlined that the "initial scope" of the work would follow the revised "M/Y Esterel Refit Work List" dated June 22, 2007; that any extended or additional work necessary to complete the interior or assist other trades would need to be authorized by Wilson Yacht; that the projected completion of the scope of the work would be the end of November 2007, subject to certain contingencies; and that payments would be 25% after the first month, 25% after the second month, 15% after the third month, and the balance due upon completion. _Id._ Attached to this proposal was a six page "M/Y Esterel Refit Work List" setting forth 218 line items and containing the same 10% provision as in the previous proposal. _Id._ The total for the third proposal was $463,610.00, and with the added ten percent the total was $509,971.00. No written contract reconciling conflicting or omitted terms between the parties' proposals was ever signed by the parties. Nevertheless, work by Windward Associates continued.

-8-

Austin sent Wilson Yacht by e-mail dated October 8, 2007 Invoice #769 for the second payment draw for interior refurbishing "per refit work list dated 6/22/07" in the amount of $122,284.00. (Plaintiff's Exhs. 7, 33; Defendants' Exh. II.)  By return e-mail dated October 9, 2007, Wilson told Austin he had received the funds and would be making the payment that day.  (Plaintiff's Exh. 33.) Payment was made on October 11, 2007.  (Defendants' Exh. LL). Wilson also asked Austin to confirm that he was still on track to complete the work on the M/Y ESTEREL in early December. (Plaintiff's Exh. 33.)  Austin by return e-mail told Wilson that early December was looking possible, but he would be more confident of his answer in two weeks.  Id.

The refurbishing and refit of the Vessel took considerably longer than the original three month time line because the scope of the work kept increasing and there were other contractors working on the vessel.  Both Claudia Molina and Seger made numerous changes that added extra work.  For example, Wilson Yacht attributed over $77,000 worth of changes to Claudia Molina.  (Defendants' Exh. YYY.)  None of the changes were in writing or by formal change order, but were referenced generally in various subsequent correspondence.  Additionally, Austin began specifically delineating extra work on his invoices to Wilson Yacht.

On November 19, 2007, Austin sent Wilson Yacht Invoice #817 for work performed from October 19 to November 1, 2007 (Defendant Exh. MM), Invoice #818 for extra work performed during the same

-9-

time period (Defendants' Exh. NN), and Credit Memo #767 for the same time period. (Plaintiff's Exh. 34.) Austin sent Wilson Yacht Invoice #832 dated November 19, 2007 for the third payment draw for interior refurbishing "per refit work list dated 6/22/07" in the amount of $122,284.00. (Plaintiff's Exh. 8.)

By e-mail dated November 20, 2007, Wilson stated he was waiting for funds for Austin's next payment, but expected the funds the following week because the Owner was still traveling in Europe. Wilson further stated that he was having a hard time following the invoices and how they related to the original spreadsheet. Wilson requested an overview, and Wilson added extra lines to the spreadsheet so Austin could identify the costs of the extra work. Wilson stated "[t]here will be no problem with payment, etc. but I need to be able to identify Claudia extras and state of the yacht extras to the owner." (Plaintiff's Exh. 34.) Wilson also requested an overview with regards to when each area would be completed and noted that he would like a sea trial in mid-December. Id. The third draw payment was made on November 28, 2007. (Defendants' Exh. RR.)

Austin sent Wilson Yacht Invoice #874 dated January 3, 2008, for work performed between November 30, 2007 and December 13, 2007. (Plaintiff's Exh. 9.) Austin sent Wilson Yacht Invoice #931 dated January 11, 2008, for work performed between December 13, 2007 and January 3, 2008. (Plaintiff's Exh. 10.)

Austin sent Wilson Yacht Invoice #936 dated January 21, 2008, for work performed between January 4 and January 17, 2008. (Plaintiff's Exh. 11.) This invoice specifically identified "Contract Work per Refit Work List" separately from work "Extra to Contract." Id. Also in a January 21, 2008 e-mail, Austin told Wilson that the outstanding balance was $112,023.19, that Windward Associates' overdraft had been exhausted, and that "prompt payment [was] necessary to maintain momentum." (Plaintiff's Exh. 35.)

In a January 29, 2008, e-mail, Wilson told Austin that he was paying the outstanding $112,023.19 that day and hoped Austin would endeavor to have the yacht completed as much as possible by February 15, 2008. (Plaintiff's Exh. 36.) Payment was made as promised. (Defendants' Exh. XX.) Wilson continued to complain that the invoices were confusing and difficult to relate back to the original work estimates. Wilson asked that Austin use an attached work list spreadsheet in which he had identified the Extra Work by areas. Wilson stated that they needed to update the list and verify the work with Seger before any future payments and to ensure no overpayments are made. (Plaintiff's Exh. 36; Defendant Exh. ZZ.)

Austin sent Wilson Yacht a five-page Invoice #1053 dated March 10, 2008, for over $100,000.00 of extra work performed throughout the M/Y ESTEREL. (Plaintiff's Exh. 12.) Austin also sent Wilson Yacht Invoice #1054 dated March 10, 2008 for a payment "per contract refit work list" in the amount of $50,000. (Plaintiff's

Exh. 13.)  Austin sent Wilson Yacht Invoice #1060 dated March 18, 2008, for extra work performed between February 29 and March 13, 2007.  (Plaintiff's Exh. 14.)  This invoice also noted that payments "Extra to Contract" so far totaled $215,116.94.  Id. Invoices #1053 and 1054 were paid on March 18, 2008. (Defendants' Exh. CCC.)

In a March 20, 2008 e-mail, Austin sent Wilson and Seger the latest spreadsheet in the format prepared by Wilson showing work through March 13, 2008.  (Plaintiff's Exh. 37.)  Austin added a column with additional information about labor/materials.  Austin sent Wilson Yacht Invoice #1088 dated March 31, 2008, for work performed between March 14 and March 27, 2007.  (Plaintiff's Exh. 15.)  Austin sent Wilson Yacht Invoice #1111 dated April 14, 2008, for extra work performed between March 28 and April 10, 2008. (Plaintiff's Exh. 16.)  Austin sent Wilson Yacht Invoice #1133 dated April 28, 2008, for work performed between April 11 and April 24, 2008.  (Plaintiff's Exh. 17.)  Austin's e-mail forwarding the extra work invoice provided the balance and asked for payment. (Defendants' Exh. LLL.)

By return e-mail dated April 29, 2008, Wilson stated they were trying to balance what was owed but were having problems reconciling the new invoices with the outstanding amount.  Wilson asked for a statement of account, one for the original contract work and one for the extra work.  (Defendants' Exh. LLL.)  A work list dated May 5, 2008 was provided.  (Defendants' Exh. MMM.)

Austin sent Wilson Yacht Invoice #1148 dated May 5, 2008, for work performed between March 31 and April 24, 2008. (Plaintiff's Exh. 18.) Invoices #1060, 1088, 1111, 1133, and 1148 were paid on May 9, 2008. (Defendants' Exh. OOO.)

Austin then sent a series of invoices separating contract work from extra work, none of which were paid. Austin sent Wilson Yacht Invoice #1154 dated May 12, 2008, for work performed pursuant to the contract between April 25 and May 8, 2008. (Plaintiff's Exh. 19.) Also on May 12, 2008, Austin sent Wilson Yacht Invoice #1155 for extra work performed between April 25 and May 8, 2008. (Plaintiff's Exh. 20.) On May 28, 2008, Austin sent Wilson Yacht Invoice #1180, for work performed pursuant to the contract, and Invoice #1181, for extra work performed, between May 9 and May 22, 2008. (Plaintiff's Exhs. 21, 22.) Austin sent Wilson Yacht Invoice #1195, dated June 9, 2008, for work performed pursuant to the contract between May 22 and June 5, 2008. (Plaintiff's Exh. 23.) Austin also sent Wilson Yacht Invoice #1196 dated June 9, 2008, for extra work performed between May 22 and June 5, 2008. (Plaintiff's Exh. 24.) On June 16, 2008, Austin sent Wilson the spreadsheet of the current project costs, which included unpaid invoices. (Plaintiff's Exh. 38.) Austin sent Wilson Yacht Invoice #1205 dated June 23, 2008, for extra work performed between June 6 and June 19, 2008. (Plaintiff's Exh. 25.)[3]

_____

[3] Plaintiff has withdrawn its request for payment of Invoice
(continued...)

On June 17, 2008, Austin sent Wilson a short e-mail inquiring as to the status of the invoices and a time frame for payment. (Plaintiff's Exh. 39.) In a June 18, 2008 e-mail, Wilson informed Austin that it would be July 8 before he could be sure to have the funds to clear the balance of the account. Wilson noted that the yacht was still stuck in Ft. Lauderdale because of paperwork issues, and that the Owner was very frustrated and would not be receptive to more funds until the yacht arrived in Naples. (Plaintiff's Exh. 39.)

In June 2008, Wilson asked Seger to perform an "audit" of the extra work performed by Windward Associates. Using the Windward Associates invoices, which he had never seen while the work was being done, and a Work List dated June 23, 2008 (Plaintiff's Exh. 42; Defendants' Exh. YYY), Seger identified entries which were objectionable because (1) the work was not authorized, or (2) the work was authorized but the charged cost was excessive, or (3) the work was part of the original contract but billed as extra work. Seger testified that this objectionable work was billed at about $112,000.00. As to the other extra work, Seger concluded that the work had been authorized, performed and priced reasonably. Seger identified no problems with any of the work or charges for work that was identified as being performed pursuant to the contract.

---

[3](...continued)
#1211, since it does not involve the M/Y ESTEREL.

On July 7, 2008, Austin sent Wilson an updated Work List spreadsheet. (Plaintiff's Exh. 40.) This updated spreadsheet showed work under contract totaling $510,296.45 and extra work totaling $303,240.69, with outstanding balances of $28,009.14 on contract work and $39,877.62 on extra work.

On July 25, 2008, Austin sent Wilson an e-mail inquiring about the outstanding final balance and stating he was at the end of his personal finances to keep his people working. (Plaintiff's Exh. 41.) On July 29, 2008, Wilson responded by e-mail that the Owner was "still moaning about the whole cost of the refit and everything else." Id. Wilson stated he had copies of the invoices but needed a final overview on the spreadsheet showing the original work, the extras, the total amount paid and the total owed. Id. Austin sent Wilson Yacht Invoice #1233 dated August 4, 2008, for extra work performed between June 20 and July 31, 2008. (Plaintiff's Exh. 27.)

Seger met a couple of times with Austin regarding the outstanding invoices, but Austin simply said that he did the work and deserved to be paid. E-mails in August 2008, (Defendants' Exh. JJJJ, KKKK) failed to resolve the issues. Plaintiff seeks a maritime lien in the amount of $72,777.42 ($74,644.28 minus $1,866.86) based upon the non-payment of Invoices #1154, 1155, 1180, 1181, 1195, 1196, 1205, and 1233.

The M/Y ESTEREL was arrested in the Fort Myers Division of the Middle District of Florida on September 2, 2009. The Vessel was

released by stipulation upon filing a cash bond in the amount of $82,122.95 in the registry of the court. (Docs. #10, 11, 12.)

At trial, Defendant's expert Roy Shorter (Shorter) utilized the final spreadsheet as annotated by Wilson Yacht (Plaintiff's Exh. 42; Defendants' Exh. YYY) to identify in a line-by-line fashion inappropriate charges by Windward Associates which exceed the amount of the requested maritime lien. Shorter also testified that the parties were operating under a fixed price contract, and Windward Associates simply had to absorb any extra costs. Austin testified in rebuttal, responding in a line-by-line fashion why each charge was not inappropriate or excessive, and that it was always a time and materials agreement.

## II.

### A. Jurisdiction

The parties agree that this action arises under the Maritime Lien Act, 46 U.S.C. § 31301, et. seq, and general maritime law, and that this court has subject matter jurisdiction and personal jurisdiction over the parties. (Doc. #47, p. 1.) The Court also agrees. "Maritime jurisdiction is a prerequisite to a claim against a vessel asserting a maritime lien." <u>Wilkins v. Commercial Inv. Trust Corp.</u>, 153 F.3d 1273, 1276 (11th Cir. 1998). The agreement at issue was wholly maritime in nature and pertained directly to and was necessary for commerce or navigation upon navigable waters. <u>See, e.g.</u>, <u>Inbesa Am., Inc. v. M/V Anglia</u>, 134

F.3d 1035, 1036 (11th Cir. 1998). Since the vessel was within the jurisdiction of the court at the time of its arrest, and Wilson Yacht is a Florida limited liability corporation doing business within the Fort Myers Division of the Middle District of Florida, personal jurisdiction is also satisfied.

## B. General Legal Principles

As the Eleventh Circuit recently stated, "[w]here a case arises in admiralty, we apply the general maritime law. [ ] General maritime law is federal law. [ ]  However, when neither statutory nor judicially created maritime principles provide an answer to a specific legal question, courts may apply state law provided that the application of state law does not frustrate national interests in having uniformity in admiralty law." Sea Byte, Inc. v. Hudson Marine Mgmt. Servs., Inc., 565 F.3d 1293, 1298 (11th Cir. 2009)(internal citations and quotations omitted.)  Both sides in this case rely upon Sweet Pea, which states in part:

> Federal admiralty jurisdiction is invoked by a claim that an oral contract regarding the repair of a vessel was breached. [ ] To recover damages on such a claim, a plaintiff must prove (1) the terms of a maritime contract; (2) that the contract was breached; and (3) the reasonable value of the purported damages. [ ] To establish a maritime lien on a vessel pursuant to 46 U.S.C. § 31342 in an in rem action, a plaintiff must prove: (1) it provided "necessaries" (2) at a reasonable price (3) to the vessel (4) at the direction of the vessel's owner or agent.

Sweet Pea Marine, Ltd. v. APJ Marine, Inc., 411 F.3d 1242, 1249 (11th Cir. 2005)(internal citations omitted).

## C. Breach of Contract Claim Against Wilson Yacht

At the conclusion of the plaintiff's case, the Court granted Wilson Yacht's motion under Fed. R. Civ. P. 52(c) as to the Count 2 breach of contract claim against it.  The Court found that Wilson Yacht was a fully disclosed agent and that no contract, and therefore no liability for breach of contract, existed between Wilson Yacht and plaintiff.  See, e.g., Whitney v. Wyman, 101 U.S. 392, 396 (1879) ("Where the principal is disclosed, and the agent is known to be acting as such, the latter cannot be made personally liable unless he agreed to be so"); Babul v. Golden Fuel, Inc., 990 So. 2d 680, 683 (Fla. 2d DCA 2008)("[A]n agent acting within the course and scope of its agency relationship with a disclosed principal is not liable for the debts or obligations of the principal arising from contracts which the agent may negotiate or execute on behalf of such disclosed principal.  [ ]  If the contracting party knows the identity of the principal for whom the agent purports to act, the principal is deemed to be disclosed." (internal citations omitted.)  Therefore, judgment will be entered in favor of Wilson Yacht as to Count 2 of the Complaint, and shall take nothing.

## D. Maritime Lien Against Vessel

The Maritime Commercial Instruments and Liens Vessel Identification Act ("the Maritime Liens Act") provides that "a person providing necessaries to a vessel on the order of the owner

or a person authorized by the owner . . . has a maritime lien on the vessel." 46 U.S.C. § 31342. "A maritime lien is a special property right in a ship given to a creditor by law as security for a debt or claim subsisting from the moment the debt arises." Dresdner Bank AG v. M/V OLYMPIA VOYAGER, 465 F.3d 1267, 1272 (11th Cir. 2006)(citation and internal quotation omitted). To obtain a maritime lien against a vessel, plaintiff must prove that it (1) provided "necessaries" (2) at a reasonable price (3) to the vessel (4) at the direction of the vessel's owner or agent. Sweat Pea, 411 F.3d at 1249. "A suit in rem to enforce a maritime lien is limited to the value of the lien itself." Bradford Marine, Inc. V. M/V SEA FALCON, 64 F.3d 585, 588-89 (11th Cir. 1995).

**(1) Provide Necessaries to the Vessel at Owner's/Agent's Direction:**

It is not seriously argued that plaintiff has not established these three elements. "The term 'necessaries' has been liberally construed to include . . . goods or services that are useful to the vessel, keep her out of danger, and enable her to perform her particular function. Necessaries are the things that a prudent owner would provide to enable a ship to perform well the functions for which she has been engaged." In Re Container Applications Int'l, Inc., 233 F.3d 1361, 1363 n.3 (11th Cir. 2000). "Necessaries" include repairs to a vessel. See 46 U.S.C. § 31301(4); Rose v. M/V GULF STREAM FALCON, 186 F.3d 1345, 1348 (11th Cir. 1999).

To "provide" necessaries to a vessel requires "that there be a direct connection between the provider of necessaries and a specific vessel." <u>Container Applications</u>, 233 F.3d at 1363. Windward Associates physically supplied the goods and services to the vessel pursuant to the agreement. Therefore, Windward Associates "provided" necessaries to the vessel. <u>Galehead, Inc. v. M/V Anglia</u>, 183 F.3d 1242, 1245 (11th Cir. 1999).

A "vessel" "includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. This is the definition used in admiralty and maritime jurisdiction. <u>Board of Comm'rs of Orleans Levee Dist. v. M/V BELLE OF ORLEANS</u>, 535 F.3d 1299, 1306-12 (11th Cir. 2008). The Court finds, and no one disputes, that the M/Y ESTEREL is a watercraft used and capable of being used as a means of transportation on water, and is therefore a "vessel."

The Court also finds that plaintiff has established that his work was performed at the direction of the Owner or his agent. The evidence clearly established that Wilson Yacht was the Owner's disclosed agent, and that the Owner, Wilson, and Seger gave and/or ratified directions to Windward Associates as to the work to be performed, including the work at issue in Plaintiff's claim.

**(2) Reasonable Price:**

The M/Y ESTEREL argued in closing argument that Windward Associates failed to establish that the necessaries provided to the

vessel were done at a reasonable price.  Indeed, it is argued that plaintiff was overpaid for the work.

As <u>Sweet Pea</u> stated,

the "reasonableness" of charges, in the maritime context, is measured by whether they are "customary," [ ] and "in accord with prevailing charges for the work done and the materials furnished," [ ] Accordingly, to satisfy the evidentiary burden on this element, a plaintiff must present some modicum of evidence which compares the charges claimed with what other competitors would have charged for similar work or materials. [ ] This burden may be satisfied by witness testimony that the charges were reasonably in accord with industry standards. [ ] The failure to present such evidence, however, dictates that a plaintiff cannot prevail on its maritime claims."

<u>Sweet Pea</u>, 411 F.3d at 1249 (internal citations omitted.)

The Court finds that the evidences establishes that the prices Windward Associates charged were reasonable.  It was undisputed that the charge of $60 per hour and a 15% markup were reasonable under industry standards.  Plaintiff also presented evidence that its charges were lower than its competitors.  Austin testified to this at trial, and the e-mail from Wilson to the Owner attested to the competitiveness of plaintiff's rates ("the sub contractor is known to me and does excellent work and compared others his prices are reasonable. . ." (Plaintiff's Exh. 28.)  The Court finds that the charges were customary and in accord with prevailing charges for the work done and materials supplied in the yachting industry.[4] The Court credits the testimony of Austin over the testimony of

---

[4] Profit is included in the reasonable price of necessaries. <u>Galehead</u>, 183 F.3d at 1246-47.

Seger and Shorter where there is a conflict, particularly Austin's explanation of the reasons for the prices charged for the work challenged by Shorter or Seger. The Court found the explanations fully credible. The Court rejects as untrue assertions that work was not authorized or that costs were excessive under the circumstances of this case. The Court also finds that the agreement under which the parties were operating was a time and materials agreement, not a fixed price agreement. The draw system was a ministerial accommodation made by Austin at the request of Wilson, not an indication of a fixed price contract. It is clear from the various proposals and spreadsheets and the course of conduct of the parties that the parties were operating under a time and materials agreement.

The Court further finds that Windward Associates did all the work reflected in Invoices #1154, 1155, 1180, 1181, 1195, 1196, 1205 and 1233, that all the work was authorized, that the work was performed in an objectively reasonable manner and was of the quality agreed upon, that payment for this work was due and owing from the Owner, and that the Owner has not paid the sums due and owing. The amount due and owing under these invoices is $72,777.42. Therefore, a maritime lien shall issue for the M/Y ESTEREL in this amount. The Court finds there are no peculiar circumstances which would make it inequitable for the losing party to pay prejudgment interest. St. Paul Fire and Marine Ins. Co. v. Lago Canyon, Inc., 561 F.3d 1181, 1191-92 (11th Cir. 2009).

Therefore, prejudgment interest on this amount will also be awarded. "The rate of prejudgment interest that should be awarded is the prime rate during the relevant period." <u>Northern Ins. Co. Of N.Y. v. Chatham County, Ga.</u>, 309 Fed. Appx. 292 (11th Cir. 2009)(quoting <u>Sunderland Marine Mut. Ins. Co. v. Weeks Marine Constr. Co.</u>, 338 F.3d 1276, 1280 (11th Cir.2003) (internal citation omitted)).

**(3) Affirmative Defenses:**

The Court finds no basis for the first affirmative defense. The Court finds that defendants have not paid all the amounts due to Windward Associates, and owes the amounts set forth above.

The Court finds no basis for the second affirmative defense. The Court finds that Windward Associates did not exceed the scope of the work agreed-upon between the parties, and accomplished the work pursuant to the agreed upon specifications. The time period for performance was never of the essence, was changed with both the express and implied consent of the parties, and was extended due to numerous extra work added to the project. Windward Associates completed all work reflected in the invoices at issue, and there is no legal basis to assert estoppel.

The Court finds no basis for the third affirmative defense. The Court finds that all work was authorized and ratified by a person or persons with the authority to do so.

The Court finds no basis for the fourth affirmative defense. As stated above, the work was performed in a timely fashion given

the extra work added to the project and the explicit and implicit agreements of the parties.

The Court finds no basis for the fifth affirmative defense. Windward Associates did not abandon the project. All work reflected in the invoices was performed, although one aspect of the task was not completed after Plaintiff was not paid for any of the invoices at issue.

The Court finds no basis for the sixth affirmative defense. Oral contracts are valid under maritime law, and the statute of frauds does not apply. <u>Kossick v. United Fruit Co.</u>, 365 U.S. 731, 742 (1961).

The Court finds no basis for the seventh affirmative defense. Windward Associates does not have unclean hands, but rather had the assent and approval of an authorized person(s) for all the work performed. Seger was present at the job site daily, and both authorized work and did not object to work being done.

Accordingly, it is now

**ORDERED:**

1.  The Clerk of the Court shall enter judgment in favor of Windward Associates Corp., a Florida corporation, and against the M/Y ESTEREL, her engines, tackle, equipment, rigging, dinghies, furniture, appurtenances, etc., *in rem,* and impose a maritime lien in the amount of $72,777.42, plus prejudgment interest.

2.  The Clerk of the Court shall enter judgment in favor of defendant Wilson Yacht Management (USA), LLC, a Florida Limited liability company, and against Windward Associates Corp., a Florida corporation, as to Count 2, and plaintiff shall take nothing on Count 2.

3.  The Clerk is directed to disburse funds on deposit in the Registry of the Court in the amount of Eighty-two Thousand, One hundred twenty-two dollars and Ninety-four cents ($82,122.94) plus any accrued interest, representing the total sum left on deposit, to the defendant Wilson Yacht Management (USA), LLC, leaving no sum on deposit.

**DONE AND ORDERED** at Fort Myers, Florida, this __30th__ day of November, 2009.

JOHN E. STEELE
United States District Judge

Copies:
Counsel of record